## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 7 |
| Xceligent, Inc., | Case No.  17-12937 (CSS) |
| Debtor. | **Hearing Date: May 15, 2019 at 11:15 a.m. (EST)** <br> **Objection Deadline:  May 8, 2019 at 4:00 p.m. (EST)** |

### TRUSTEE'S MOTION FOR APPROVAL OF SETTLEMENT
### OF PUTATIVE CLASS ACTION

Alfred T. Giuliano, as chapter 7 trustee (the "Trustee") for the estate (the "Estate") of debtor Xceligent, Inc. (the "Debtor"), hereby moves for entry of an order approving a certain settlement between and among the Trustee and Erin Curry on the one hand, and Elisabeth Borchers (the "Representative Plaintiff") individually and on behalf of a certain putative settlement class on the other hand, and states as follows:

### Jurisdiction, Core Nature, And Venue

1.     The United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") has jurisdiction to consider this matter pursuant to 28 U.S.C. §1334.  This matter is a core proceeding within the meaning of 28 U.S.C. §157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§1408 and 1409002E

### Background

2.     On December 14, 2017 (the "Petition Date"), the Debtor commenced its above-captioned bankruptcy case by filing a voluntary petition under chapter 7 of the Bankruptcy Code in the Bankruptcy Court.  On or shortly after the Petition Date, the Trustee was appointed by the Office of the United States Trustee.

3.     The Debtor owns insurance policies, including a certain insurance policy issued

by Markel Syndicate Management Limited (in its capacity as managing agent for Syndicate 3000 at Lloyd's) ("Markel") having policy number QK1604586/B0823QK1604586, and a certain insurance policy issued by Federal Insurance Company (together with Markel, the "Insurers") having policy number 8248-3557 (together, the "Policies").  The Policies together carry a combined limit of liability of at least $20,000,000, subject to the terms and conditions of the individual policies.

4.    On or about April 11, 2017, the Representative Plaintiff filed a complaint commencing a putative class action suit (the "Litigation") against the Debtor and Erin Curry, the former chief human resources officer of the Debtor, in the Circuit Court of Jackson County, Missouri (the "State Court"), captioned *Elisabeth Borchers, on behalf of herself and all persons similarly situated v. Xceligent, Inc. and Erin Curry*, which is presently pending at case No. 1716-CV08149.  A plaintiff class has not yet been certified.

5.    The Representative Plaintiff alleged in her complaint, *inter alia*, that on or about October 27, 2016, Xceligent informed its employees that their IRS W-2 forms may have been disseminated to unauthorized persons (the "Data Disclosure") as a result of a "phishing attack," made by an unauthorized individual on Xceligent's computer system.

6.    The Litigation seeks certification of a class of former Xceligent employees and Missouri residents whose personally identifiable information contained in W-2 forms was allegedly disclosed in the incident, and seeks to recover damages on behalf of those would-be class members.  The complaint seeks relief under common law theories of negligence and breach of implied contract, asserts that the affected individuals were damaged or will be damaged in the future by the disclosure of the W-2 information, and alleges that Xceligent was negligent in

2

failing to prevent the phishing attack and in its conduct following the phishing attack.  The Representative Plaintiff requests that the State Court hold Xceligent responsible for paying the retail cost of credit monitoring for all class members for at least 30 years, which would create a potential legal exposure of more than $4,000,000.00 for Xceligent.  Prior to the Petition Date, the State Court had already stated that it intended to grant class certification.

7.    On March 2, 2018, following a motion filed by the Representative Plaintiff, the Bankruptcy Court entered an *Order Approving Stipulation Granting Elisabeth Borchers Relief From the Automatic Stay* [docket No. 78], in which the Bankruptcy Court approved a certain stipulation dated March 1, 2018 between the Trustee and the Representative Plaintiff.  *Inter alia*, this stipulation provided that the automatic stay of 11 U.S.C. §362(a) shall be modified to allow the Representative Plaintiff to pursue the Litigation solely for the purpose of recovering proceeds under any applicable insurance policies, and that the Representative Plaintiff, on behalf of a certified class, may recover from insurance carriers and applicable insurance proceeds without need for further order of the Bankruptcy Court.

8.    Xceligent, through Baker & Hostetler, its outside defense counsel in the Litigation ("Defense Counsel")[1], denied any liability for the Data Disclosure, and asserted certain defenses. The Trustee, through Defense Counsel, and the Representative Plaintiff entered into arm's length negotiations, and reached an agreement to resolve all claims related to the Data Disclosure pursuant to the terms and conditions set out in a certain settlement agreement (the "Settlement,"

---

[1] Baker & Hostetler (Defense Counsel) pursuant to the Policies defended both the Trustee for the Estate of the Debtor and Erin Curry in the Litigation.  In addition, Baker & Hostetler was employed to represent the Trustee for the Estate of the Debtor (and its affiliated debtors) as special defense counsel in the litigation styled as *CoStar Group Inc. et al v. Xceligent Inc. et al,* Case No. 4:16-cv-01288-FJG pending in the United States District for the Western District of Missouri (the " CoStar Matter").  Baker & Hostetler was approved by certain of the Debtors' insurance carriers (the "Instructing Insurers") to represent the Estate of the Debtor in defending the CoStar Matter and is being compensated for such services as special defense counsel from the policies of insurance issued by the Instructing Insurers.

3

set out in the "Settlement Agreement").[2]  A copy of the Settlement Agreement is attached to this

Motion as Exhibit "A" and incorporated herein by reference.

        9.      The Settlement Agreement includes the following principal terms, which are

subject to Bankruptcy Court[3] and State Court approval, and other conditions as set out in the

Settlement Agreement: [4]

    a.    <u>Preliminary State Court Approval; Certification of Settlement Class</u>:  The
Representative Plaintiff's counsel, McInnes Law LLC, Bell Law, LLC, and Waddel
Law Firm LLC (together "<u>Plaintiff's Counsel</u>"), will apply to the State Court for:
preliminary approval of the Settlement Agreement; appointment of a claims
administrator; certification, for settlement purposes only, of an opt-out class
consisting of all 563 former Xceligent employees whose W-2 data was allegedly
compromised as a result of the Data Disclosure (as defined in the Settlement
Agreement, the "<u>Settlement Class</u>"); approval of notice procedures; and related relief.
[Settlement Agreement at ¶¶1.22, 3-4].

    b.    <u>Final State Court Approval</u>:  Plaintiff's counsel will request that the State Court
schedule a final fairness hearing for consideration of final approval of the Settlement,
following a period of time during which Settlement Class Members may submit opt-
out forms, claims for reimbursement of out-of-pocket expenses resulting from the
Data Disclosure, and/or objections to the Settlement.  [Settlement Agreement at ¶¶3-
5].

    c.    <u>Common Fund Payments to Each Class Member</u>:  The Insurers will establish a
settlement fund of $563,000.00, funded entirely using proceeds of the Policies
("<u>Proceeds</u>"), which shall be disbursed in the amount of $1,000 to each member of
the Settlement Class.  [Settlement Agreement at ¶2.1].

    d.    <u>Incentive Award</u>:  The Insurers will pay a $4,000 award to the Representative
Plaintiff, funded entirely from Proceeds.  [Settlement Agreement at ¶7.3].

---

[2] Capitalized terms used in this Motion and not otherwise defined herein shall have the meanings provided in the
Settlement Agreement.

[3] Bankruptcy Court approval shall not be necessary in the event that the Bankruptcy Court rules, states on the record,
or states in writing that no such approval is necessary.  Should any person or entity object to, or otherwise oppose,
the Settlement, the Settlement Agreement, and/or this Motion for any reason, each of the parties expressly reserves
the right to argue that Bankruptcy Court approval of the Settlement and/or the Settlement Agreement is not required
in light of the "Stipulation Granting Elisabeth Borchers Relief from the Automatic Stay" which was approved by the
Bankruptcy Court by Order dated March 2, 2018, docket number 78.

[4] This Motion contains a summary of certain terms of the Settlement Agreement, and does not set out all of the
terms.  The complete terms of the Settlement are set out in the Settlement Agreement itself (together with any
external documents incorporated into the Settlement Agreement by reference).  The Settlement Agreement itself
should be consulted for the complete terms of the Settlement.  To the extent of any inconsistency between this
Motion and the Settlement Agreement, the Settlement Agreement shall govern.

e.  Attorney's Fees and Costs:  The Insurers will pay $546,985 in attorney's fees and costs to Plaintiff's Counsel, funded entirely from Proceeds.  [Settlement Agreement at ¶7.2].

f.  Reimbursement of Expenses on a Claims Made Basis:  The Insurers will provide reimbursement of documented out-of-pocket expenses that are credibly a result of the Data Disclosure, up to $1,200 per person, on a "claims made" basis for Settlement Class Members who submit a valid claim form, funded entirely from Proceeds.  The total cost of this portion of the settlement is unknown, but the Insurers believe that it is likely to be far less than the $675,600 maximum based on the class size of 563 individuals that could potentially be claimed, as most claimants are likely to have no significant out-of-pocket losses.  [Settlement Agreement at ¶2.2].

g.  Extended Identity Theft Protection for Three Years:  The Insurers will pay for extended identity theft protection for three years for all Settlement Class Members, funded entirely from Proceeds.  The cost of this component of the Settlement will depend on the number of individuals who enroll, but the Insurers conservatively estimate the cost at no more than $75,000.  [Settlement Agreement at ¶2.3].

h.  Claims Administration Costs:  The Insurers will pay for the costs of the claims administrator, Epiq Class Action & Claims Solutions, Inc. ("Epiq,"), funded entirely from Proceeds.  The Insurers estimate these costs at a total of $73,116.17. [Settlement Agreement at ¶2.5].

i.  Releases:  The Settlement Agreement provides:

    i.  "Released Claims" shall collectively mean any and all claims and causes of action by Settlement Class Members relating to [the] Data Disclosure, including, without limitation, any causes of action under 18 U.S.C. § 2701 *et seq.*, and all similar statutes, in effect in any states in the United States as defined herein; negligence; negligence per se; breach of contract; breach of implied contract; breach of fiduciary duty; breach of confidence; invasion of privacy; misrepresentation (whether fraudulent, negligent or innocent); unjust enrichment; bailment; wantonness; failure to provide adequate notice pursuant to any breach notification statute or common law duty; and including, but not limited to, any and all claims for damages, injunctive relief, disgorgement, declaratory relief, equitable relief, Attorneys' Fees and expenses, pre-judgment interest, credit monitoring services, the creation of a fund for future damages, statutory damages, punitive damages, special damages, exemplary damages, restitution, the appointment of a receiver, and any other form of relief that either has been asserted, or could have been asserted, by any Settlement Class Member against any of the Released Persons [defined in the Settlement Agreement as the Estate and Ms. Curry] based on, relating to, concerning or arising out of the Data Disclosure and alleged theft of the W-2s or other personally identifiable information, or the allegations, facts, or circumstances described in the Litigation.  Released Claims shall not include the right of any

5

Settlement Class Member or any of the Released Persons to enforce the terms of the settlement contained in this Settlement Agreement, and shall not include the claims of Settlement Class Members who have timely excluded themselves from the Settlement Class.

ii.  Upon the Effective Date [as defined in the Settlement Agreement], each Settlement Class Member, including Representative Plaintiff, shall be deemed to have, and by operation of the Judgment [i.e. the judgment entered by the State Court approving the Settlement on a final basis] shall have, fully, finally, and forever released, relinquished and discharged all Released Claims.  Further, upon the Effective Date, and to the fullest extent permitted by law, each Settlement Class Member, including Representative Plaintiff, shall, either directly, indirectly, representatively, as a member of or on behalf of the general public or in any capacity, be permanently barred and enjoined from commencing, prosecuting or participating in any recovery in any action in this or any other forum (other than participation in the settlement as provided herein) in which any of the Released Claims is asserted.

iii.  Upon the Effective Date [of the Settlement], [the Estate] and Curry shall be deemed to have, and by operation of the Judgment shall have, fully, finally and forever released, relinquished and discharged, Representative Plaintiff, each and all of the Settlement Class Members, and [Plaintiff's Counsel] of all claims, including Unknown Claims, based upon or arising out of the institution, prosecution, assertion, settlement or resolution of the Litigation or the Released Claims, except for enforcement of the Settlement Agreement.  Any other claims or defenses [the Estate] or Curry may have against such Persons including, without limitation, any claims based upon or arising out of any employment, retail, banking, debtor-creditor, contractual or other business relationship with such Persons that are not based upon or do not arise out of the institution, prosecution, assertion, settlement or resolution of the Litigation or the Released Claims are specifically preserved and shall not be affected by the preceding sentence.

iv.  Notwithstanding any term herein, neither [the Estate], nor its Related Parties [as defined in the Settlement Agreement], nor Curry shall have or shall be deemed to have released, relinquished or discharged any claim or defense against any Person other than Representative Plaintiff, each and all of the Settlement Class Members, [and the Plaintiff's Counsel].

[Settlement Agreement at ¶¶1.19, 6].

10.  In addition to the Settlement Agreement, the Settlement contemplates that the parties will enter into a separate Escrow Agency Agreement with Epiq, as escrow agent, pursuant to which the Insurers will pay the funds that are eventually to be disbursed as part of the

6

Settlement to Epiq, to be temporarily held in an escrow account pursuant to the terms of the

Escrow Agency Agreement.  A copy of the Escrow Agency Agreement is attached to this Motion

as part of Exhibit "A."  Because the Escrow Agency Agreement is purely ministerial, and is part

and parcel of the Settlement, for purposes of this Motion the term "Settlement Agreement" shall

include the Escrow Agency Agreement.

11.     All in all, Defense Counsel and the Insurers estimate the total cost of the

Settlement at approximately $2.19 million.

12.     Importantly, the Settlement Agreement provides that the Insurers will fund the

entire cost the Settlement, using solely the Proceeds.  The Estate will not be responsible for any

payments, costs, or outlays of any kind.  In addition, the Trustee will not be responsible for

taking any actions to implement the Settlement.  Any such actions required of the Estate will be

performed by Defense Counsel, whose fees and costs will be paid entirely by the Insurers from

Proceeds.

## Summary of Relief Requested

13.     The Trustee requests that the Bankruptcy Court enter an order: (i) approving the

Settlement Agreement; (ii) authorizing the Trustee to enter into the Settlement Agreement and

take any actions necessary to carry out the terms thereof; and (iii) providing any other and further

relief that may be appropriate.

## Applicable Authority

14.     Bankruptcy Rule 9019 governs the approval of compromises and settlements, and

provides as follows:

On motion by the Trustee and after notice and a hearing, the court may approve a

7

compromise or settlement.  Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.

Fed. R. Bankr. P. 9019.

15.     The settlement of time-consuming and burdensome litigation, especially in the bankruptcy context, is encouraged and "generally favored." In re World Health Alternatives, Inc., 344 B.R. 291, 296 (Bankr. D. Del. 2006); see also In re Penn Central Transp. Co., 596 F.2d 1102, 1113 (3d Cir. 1979) ("In administrating reorganization proceedings in an economical and practical matter it will often be wise to arrange the settlement of claims . . . .").

16.     In determining the fairness and equity of a compromise in bankruptcy, the United States Court of Appeals for the Third Circuit has stated that it is important that the bankruptcy court "apprise[] [it]self of all facts necessary [to form] an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated, [and] estimate . . . the complexity, expense and likely duration of such litigation . . . all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." Penn Central, 596 F.2d at 1114; see also In re Marvel Entm't Group, Inc., 222 B.R. 243, 249 (D. Del. 1998) (describing the "ultimate inquiry to be whether the compromise is fair, reasonable, and in the interest of the estate").

17.     The United States Court of Appeals for the Third Circuit has enumerated four factors that a court should consider in determining whether a compromise should be approved: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." Myers v. Martin (In re Martin), 91 F.3d 389, 393 (3d Cir. 1996) (citing Protective Comm. for Indep. Stockholders of TMT Trailer

Ferry, Inc. v. Anderson, 390 U.S. 414, 424-25 (1968)).

18.     In assessing a request for approval of a settlement, a court should not substitute its own judgment for that of the trustee.  The court is not to decide the numerous questions of law or fact raised by the litigation, but rather should canvas the issues to determine "whether the settlement fall[s] below the lowest point in the range of reasonableness."  Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983), cert. denied, 464 U.S. 22 (1983); see also World Health Alternatives, 344 B.R. at 296 ("[T]he court does not have to be convinced that the settlement is the best possible compromise.  Rather, the court must conclude that the settlement is 'within the reasonable range of litigation possibilities.'") (quoting Penn Central, 596 F.2d at 1114).

## Analysis

19.     The settlement of the Litigation pursuant to the terms of the Settlement Agreement meets the applicable standards under Rule 9019.  As discussed below, each of the applicable Martin factors set forth above weighs in favor of approving the Settlement, and the Settlement is certainly in the best interest of the Estate.

20.     While the Trustee believes that the Estate has viable defenses in the Litigation, he recognizes that the outcome would be uncertain.  Prior to the Petition Date, the State Court had already announced its intention to grant class certification.  If the Litigation were to proceed, the plaintiffs would ultimately present their case to a jury on behalf of a 563 person class.  Defense Counsel and the Insurers estimate the potential legal exposure at in excess of $4 million.  The issues, no matter how they may be decided by the State Court, are such that the losing party or parties are likely to pursue appellate review.  At best, the Estate's probability of success on the

9

merits would be highly uncertain.

21.    Any litigation would be protracted and expensive not only for the Estate, but also for Ms. Curry, who is also an insured under the Policies.  Protracted litigation may exhaust the Policies through payment of defense costs, leaving insufficient or no coverage remaining for damages in the event that the plaintiffs are victorious.[5]

22.    The estimated costs of the Settlement, $1.2 to $1.9 million, are obviously much lower than the potential exposure.  Moreover, the Settlement Agreement provides that the Insurers will fund the entire cost the Settlement, using solely proceeds of the Policies.  The Estate will not be responsible for any payments, costs, or outlays of any kind, and the Trustee will not be responsible for taking any actions to implement the Settlement.

23.    Under the circumstances, the Trustee submits that the Settlement is certainly in the best interest of the Estate.  The Settlement avoids the delays and risks described above in favor of a prompt and efficient resolution at essentially no cost to the Estate.

## Notice and Conclusion

24.    The Trustee will serve notice of this Motion on: (i) the Debtor; (ii) the Office of the United States Trustee; (iii) the Representative Plaintiff through the Plaintiff's Counsel; (iv) the Insurers; (v) Ms. Curry; (vi) Epiq; (vii) the Debtor's twenty largest unsecured creditors; and (viii) all parties who have requested such notice pursuant to Federal Rule of Bankruptcy Procedure 2002 as of this date.

---

[5] Upon information and belief, the Policies have already been eroded by $449,185.43 in defense costs incurred to date.

LEGAL\39397903\6 00600.9698.000/420979.000

WHEREFORE, the Trustee respectfully requests that the Bankruptcy Court enter an order substantially in the form attached: (i) approving the Settlement Agreement; (ii) authorizing the Trustee to enter into the Settlement Agreement and take any actions necessary to carry out the terms thereof; and (iii) providing any other and further relief that may be appropriate.

Dated: April 4, 2019                          COZEN O'CONNOR

                                              */s/ Simon E. Fraser*
                                              _____

                                              John T. Carroll, III (No. 4060)
                                              Simon E. Fraser (No. 5335)
                                              1201 N. Market Street
                                              Suite 1001
                                              Wilmington, DE 19801
                                              Telephone: (302) 295-2000
                                              Fax: (302) 295-2013
                                              jcarroll@cozen.com
                                              sfraser@cozen.com

                                              *Attorneys for the Trustee*