IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| XCELIGENT, INC. <br> Debtor. | Case No.  17-12937 (CSS) |
| ALFRED T. GIULIANO, CHAPTER 7 TRUSTEE, <br> Plaintiff, <br> v. <br> DOUGLAS J. CURRY, ERIN E. CURRY, DAWN HARPSTER and NATHAN LIPOWICZ <br> Defendants. | Adversary Proceeding No. |

## **COMPLAINT**

1.      Plaintiff is Alfred T. Giuliano, in his capacity as the chapter 7 trustee (the

"Trustee") for the estate of Xceligent, Inc.  Xceligent was based in Blue Springs, Missouri and

operated and marketed a subscription database of commercial real estate information, known as

CDX, and a commercial real estate marketing platform, known as CommercialSearch (which

was available at the website www.commercialsearch.com).  Xceligent filed for bankruptcy under

chapter 7 of title 11 of the United States Code (the "Bankruptcy Code") on December 14, 2017

(the "Petition Date"), and is no longer operating.  On or about the Petition Date, the Trustee was

appointed as the chapter 7 trustee and he continues to serve in such capacity.

2.      Defendant Douglas J. Curry ("Doug") co-founded Xceligent in 1999 with his

wife, Erin E. Curry ("Erin," and together with Doug, "the Currys").  Xceligent terminated the

Currys' employment on or about October 24, 2017, shortly before the bankruptcy, after it

became public that the Currys had coordinated an illegal piracy scheme to copy content from

competitors into Xceligent's database.  Doug had served as Xceligent's Chief Executive Officer ("CEO") from its founding and as a member of Xceligent's board of directors, and Erin had served as Xceligent's Chief People Officer or Chief Human Resources Officer.

3.      Defendant Nathan Lipowicz was Xceligent's Chief Research Officer from May 2012 until its bankruptcy.  Because Xceligent depended on research to produce the commercial real estate data that populated its CDX product and CommercialSearch website, the position of Chief Research Officer was the most pivotal role at the company other than the CEO.  However, along with the Currys, Lipowicz steered Xceligent away from pursuing independent research and directed his efforts instead towards organizing a campaign of theft of data and images from Xceligent's competitors, which corrupted Xceligent's principal asset—its database of commercial real estate content—and contributed to the company's bankruptcy.  Today Lipowicz is working with Doug in a venture called Empirical CRE, an apparent clone of Xceligent. Operating Empirical CRE with the financial backing of Moody's, in so doing Doug is breaching restrictive covenants while simultaneously misappropriating Xceligent's intellectual property.

4.      Defendant Dawn Harpster was a key Xceligent liaison between management in Missouri—including the Currys and Lipowicz—and offshore contractors in the Philippines who covertly populated Xceligent's database with commercial real estate content stolen from competitors' websites.  Harpster reportedly has recently been seeking to sell all or part of a database owned by Xceligent that she unlawfully retained.

5.      Before co-founding Xceligent, the Currys had founded title and appraisal companies under the name "Pinnacle" in Kansas City.  The Pinnacle companies were implicated in the largest mortgage fraud ever seen in that city.  Brent Barber, a close business associate of the Currys, was sentenced to 12 years in federal prison for procuring millions in fraudulent

2

mortgages and bilking innocent victims in fake real estate transactions.  The Currys cooperated with the FBI and escaped prosecution.

6.    At Xceligent, Defendants' attempts to conceal their misconduct grew increasingly more sophisticated as their theft of intellectual property expanded by orders of magnitude and unraveled across the globe.  By 2016, the Currys, Lipowicz, and Harpster had engineered a covert, systematic, and international mass-piracy scheme at Xceligent—mostly targeting Xceligent's primary competitor CoStar Group, Inc. and its affiliate CoStar Realty Information, Inc. (together, "CoStar")—that extended across all markets.  That scheme eventually generated criminal indictments or civil judgments against Xceligent's agents in the United States, India, and the Philippines, subjected Xceligent to hundreds of millions of dollars in potential liability, and substantially negatively affected the value of its principal asset—namely, its database of commercial real estate data and photographs.

7.    Indeed, examinations of Xceligent's database have revealed that it contains tens of thousands of photographs that infringe others' copyrights.  One examination conducted by an independent monitor appointed by the Federal Trade Commission ("FTC") concluded in October 2018 that Xceligent improperly had derived at least *38,489* copyrighted photographs from its principal competitor, CoStar.  To place that number in context, an October 2017 federal judgment against an Xceligent agent for conspiring with Xceligent and infringing CoStar's intellectual property held that the agent would be liable to pay $20,000 per photograph per day if it were to infringe further any CoStar copyrighted image.  Applying that adjudicated per image dollar value to the FTC's findings results in potential liability of *$769,780,000.00* (seven

hundred and sixty nine million, seven hundred and eighty thousand dollars).[1]  This is the scale of liability to which Defendants' schemes subjected Xceligent.

8.      Xceligent's database likewise contains an overwhelming amount of commercial real estate data copied from competing sites.  Access records, moreover, show that Xceligent employees and agents, under the direction of Doug, Lipowicz, and Harpster, accessed competing websites to copy content without authorization *millions* of times.  Doug, Lipowicz, and Harpster facilitated this massive campaign of unauthorized access by directing offshore contractors in the Philippines and India to circumvent the anti-piracy technology of Xceligent's competitors using sophisticated tools and methods, such as TOR browsers (a tool favored by traffickers, hackers, and other criminals), proxy servers, and IP rotation.

9.      In the Philippines, Doug, Lipowicz, and Harpster retained, trained, and supervised data theft carried out by a contractor named Avion BPO Corporation ("Avion").  Avion's *modus operandi*, for Xceligent as well as another client of Avion, the notorious website backpage.com, was to trawl competing websites, copy photographs and other content, alter them to obscure their origin, then load them into its client's products.

10.     Prosecutors in the Philippines have issued criminal indictments against Avion's owners, directors, and senior managers for their roles in Avion's unlawful work for Xceligent.  In recommending criminal charges on January 3, 2019, the Philippines Department of Justice issued a Resolution stating, among other things, that Avion committed "the classic example of a computer crime" when it repeatedly circumvented the anti-piracy measures of Xceligent's competitors to copy data for Xceligent to publish on its competing website.  Those prosecutions

---

[1] Even that number is conservative.  Subsequent federal judgments have ascribed values of up to $50,000 per CoStar image.

are ongoing, and as they progress, Xceligent managers—including the Defendants—are likely to be increasingly involved as sources of evidence and potential targets.

11.     Xceligent's offshore piracy was not limited to the Philippines.  While Harpster was supervising Avion's data theft there, Doug and Lipowicz simultaneously coordinated a mass-copying campaign in India through another agent, MaxVal Technologies Pvt. Ltd. ("MaxVal"), and its American affiliate, RE BackOffice, Inc. ("REBO").

12.     On April 16, 2018, an Indian court in Mumbai issued a permanent injunction against MaxVal, which was supported by MaxVal's admissions that its employees acted at the direction of Lipowicz and other Xceligent managers "to access and copy content from websites owned by Xceligent's competitor CoStar," "set up technological workarounds . . . to circumvent the access denials," and "upload this content and these digital files into Xceligent's databases without first determining whether this data or these digital files were protected by relevant laws."

13.     By that time, the U.S. District Court for the Western District of Pennsylvania also had issued a judgment and permanent injunction against MaxVal's American affiliate, REBO, for conspiracy with Xceligent and MaxVal to violate the federal anti-hacking statute (the Computer Fraud and Abuse Act), conspiracy to engage in unfair competition, and contributory and vicarious copyright infringement.  That judgment, issued on October 23, 2017, was supported by REBO's admission that it acted unlawfully at the direction of Lipowicz, who implemented the conspiracy as follows:

> Xceligent management set up a VPN connection for the [Indian] team to use specifically to access LoopNet in order to circumvent the website block implemented by CoStar, and the [Indian] team agreed to make use of it.  The VPN connection was put in place so that a team of approximately 80 [Indian] researchers could access LoopNet without being caught by CoStar.  When the VPN was not working, Xceligent directed the [Indian] team to use other means

5

such as proxy servers, a tool commonly used by hackers, to circumvent CoStar's blocking technology.

Nate Lipowicz, Xceligent's Chief Research Officer, was primarily responsible for the VPN solution, and directed [Xceligent's Indian agent] that it should be used by the [Indian] researchers specifically to access LoopNet, bypassing CoStar's security measures. [The Indian] researchers used the VPN solution on numerous occasions to obtain unauthorized access to LoopNet when CoStar took steps to block [the Indian researchers] from LoopNet.

14.    These admissions by MaxVal and REBO are further supported by contemporaneous communications between their managers and Xceligent, which leave no doubt that they were willing participants in the Defendants' scheme. For example, in a February 27, 2013 email to Lipowicz, another Xceligent employee advised that he had "set up a VPN account" for REBO and MaxVal to use to access competitors' websites, including CoStar's LoopNet website. Lipowicz forwarded that email to a REBO/MaxVal manager, directing that "you should only have the [REBO/MaxVal] researchers access this when trying to access L[oop]N[et] sites and shouldn't use it exclusively." The manager responded: "Thanks for this wonderful solution to LoopNet Accessing Problems."

15.    When CoStar learned of Xceligent's multinational piracy of its content, it filed a lawsuit against Xceligent on December 12, 2016, for copyright infringement, violation of the Digital Millennium Copyright Act, violation of the Computer Fraud and Abuse Act, and breach of CoStar's contractual terms of use.

16.    Although the Defendants already had polluted Xceligent's database with stolen data and photographs, thereby impairing the value of what could have been the company's most valuable asset, it was the Currys' response to CoStar's lawsuit that sealed Xceligent's fate. Rather than thoroughly investigate CoStar's detailed allegations, mitigate potential damages and penalties, and seek a resolution in the best interest of the company, Doug, in consultation with

6

Erin and Lipowicz, launched an expensive counter-offensive—based on an obsolete and likely

futile antitrust theory—and vowed to fight indefinitely, no matter the cost.  Doug thus declared

to the press:  "It will be an expensive case, and we are absolutely prepared to spend what it takes

to finish it and take it to trial."  "And we intend to go to court, not settle."

17.     Further, while Doug continued to draw at least $350,000 in base salary (plus

bonuses and other benefits), the Currys proceeded to hire their own family members—paying

Doug's brother, for example, a base salary of $150,000—and family members of their trusted

lieutenants, ostensibly to help with the lawsuit.  Doug also took the opportunity to rent and move

into an apartment in Manhattan paid for by Xceligent.  Even as Xceligent's monthly operating

costs escalated to more than double its monthly revenue, the Currys sought to enrich themselves

and did nothing to stop the hemorrhaging of corporate funds.

18.     Having squandered Xceligent's resources on a massive piracy scheme, destroyed

the value of its assets, and exposed Xceligent to tremendous liability, Doug and Erin were fired

on or about October 24, 2017.  On November 30, 2017, Xceligent's majority owner wrote down

Xceligent's value to zero.  Xceligent declared bankruptcy on December 14, 2017.

19.     Immediately after the bankruptcy case was commenced, the Currys returned to

their old ways.  Despite the Currys' agreements to binding confidentiality, non-competition, and

non-solicitation provisions that survived their employment with Xceligent, Doug promptly

announced that he and Erin were starting a competitor of Xceligent and CoStar called Intrepid

CRE.  On public conference calls, Doug blamed Xceligent's failure entirely on its parent

company's "financial issues" and attempts to change "how we did business."

20.     In public statements in January 2018, Doug made dramatic projections for

Intrepid CRE's imminent success in "over 30 markets" in a matter of "weeks," which only could

have been fulfilled by leveraging Xceligent's intellectual property and customer contacts, in violation of the Currys' restrictive covenants and to the detriment of Xceligent's estate.  Indeed, Doug referenced using Xceligent's market data on conference calls, stating that he planned for Intrepid CRE to "turn on . . . 30 of the original markets that were, you know, cash flow positive and covered their own overhead," including "all the Midwestern markets, and our original markets."  The Currys even designed a logo for Intrepid CRE that willfully infringed that of Xceligent.

21.    The Trustee promptly requested that the Currys cease and desist from this misconduct in a letter dated January 5, 2018.  A lawyer for the Currys responded that they would comply with "their contractual obligations, including their obligations with respect to Confidential Information," and would refrain from "any activities that would violate their agreements with Xceligent."  The next day, the Currys made public statements to the media in which they noted the "nonsolicitation and noncompete language" in their "2012 agreements" with Xceligent, explained that they were "concerned with the risk and cost of pursuing the Intrepid CRE Initiative at this time," and stated that "for now" they were "stepping away to let the industry carry this torch forward."

22.    The Trustee responded in a January 12, 2018 letter by requesting clarification that the Currys "will never use the Debtors' assets and Confidential Information. . . , whether as part of Intrepid CRE or any other initiative."  The Trustee also requested that the Currys turn over "any of the Debtors' intellectual or other property" in their possession, such as "data, software, [or] customer contact lists."  The Currys did not respond to the Trustee's January 12, 2018 letter—apparently because they had no intention of abiding by their agreements with Xceligent.

Notably, the Currys did not contest that they continue to possess property that belongs to the Xceligent estate.

23.     In April 2018, Doug created a new commercial real estate entity named Empirical CRE, naming himself CEO and employing Erin and Lipowicz and at least four other former high-level employees or executives of Xceligent.  Doug publicly described his role in Empirical CRE as "Building the Information System for the CRE Industry to gain global insights."  On a website that it displays in the United States (www.empiricalcre.com), Empirical CRE began touting its ability to offer sophisticated software similar to software that Xceligent made available to its customers, data on tens of thousands of properties, and a commitment to providing commercial real estate information "globally."

24.     Like Xceligent, Empirical CRE also appears to be conducting "research" activities using a contractor based in the Philippines.  In addition, Harpster, who served as Xceligent's liaison with Avion, has attempted to sell data belonging to Xceligent in that country.  On March 22, 2019, Harpster received a cease-and-desist letter instructing her to return any Xceligent data in her possession to the Trustee.  Harpster failed to contest that she possesses such data, or even respond.

25.     Although Empirical CRE appears to have been assembled partly offshore, Doug registered it as a Delaware corporation in 2018 under the name Empirical CRE Holdings Corp., listing its business address as the Currys' residence in Grain Valley, Missouri.  Corporate documents reflect that the new entity's executive officers are Doug and Lipowicz, and that Mikael Nyberg is a director.  Mr. Nyberg also works as a managing director at Moody's Analytics ("Moody's"), which acquired a substantial ownership interest in Empirical CRE pursuant to an equity offering that Doug initiated in late 2018.

26.     These recent events evidence that Doug, Erin and Lipowicz, and perhaps Harpster, have found a means for continuing the unlawful scheme that destroyed Xceligent, and which threatens to destroy any remaining value in assets that belong to Xceligent's estate.  The successful efforts by the Currys and Lipowicz to obtain significant investment for such a scheme from an institutional investor like Moody's—despite the evidence that those funds are being used unlawfully to deplete Xceligent's bankruptcy estate, and to facilitate breaches of agreements between Xceligent and the Currys—presents a grave risk of further irreparable harm to the corporate assets under the care of the Trustee.

27.     Although the Trustee sent Doug, Erin, and Empirical CRE a further cease-and-desist letter dated April 3, 2019, it has not deterred them from continuing down this unlawful path.  Their counsel responded insisting—despite publicly available documents showing the contrary—that Empirical CRE does not intend to cover the United States market, is not using the Xceligent estate's property, and is not soliciting former Xceligent employees.  In light of the evidence the Trustee has amassed to date, this response makes clear that the Currys and Empirical CRE have no intention of complying with their legal obligations.

28.     The Trustee seeks legal and equitable relief against all of the Defendants to redress the lasting and ongoing damage from their misdeeds to Xceligent's estate.

29.     In particular, the Currys and Lipowicz must be held accountable for their repeated breaches of fiduciary duties of loyalty and due care to Xceligent, including by executing an illegal mass-piracy scheme that rotted the company's assets, betraying Xceligent's best interests in litigation after they were caught, and pursuing their own interests by clinging to control of the company and enriching themselves and their family members prior to Xceligent's bankruptcy.

30. Equity requires the creditor claims of wrongdoers like the Currys and Lipowicz be subordinated. These corporate insiders should not be permitted to further profit from their bad acts at the expense of the Xceligent estate's bona fide creditors.

31. Finally, the Trustee is entitled to restoration of all estate assets in the possession of the Defendants, including but not limited to the assets that Harpster attempted to sell in the Philippines, and that the Defendants appear to be leveraging in additional reckless attempts to profit from the illegal scheme that flung Xceligent into bankruptcy.

## JURISDICTION AND VENUE

32. On the Petition Date, Xceligent, Inc. and each of two related entities filed voluntary petitions for relief commencing cases under chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court").

33. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

34. This adversary proceeding is a core proceeding arising in the above-captioned bankruptcy case.

## THE PARTIES

35. Plaintiff is a citizen of New Jersey. On or about the Petition Date, the Office of the United States Trustee appointed the Trustee as the Chapter 7 trustee for Xceligent's estate. The Trustee brings this Complaint solely in his capacity as the Chapter 7 trustee, and not individually.

36. Defendant Douglas J. Curry is an individual residing at 9701 S Perdue Rd, Grain Valley, MO 64029-8100. Doug was a co-founder of Xceligent and held the position of Chief Executive Officer from at least 1999 until he was terminated from that position on or about

October 24, 2017.  Doug also was a member of Xceligent's board of directors from at least May

3, 2012 until on or about October 24, 2017.

37.    Defendant Erin E. Curry is an individual residing at 9701 S Perdue Rd, Grain

Valley, MO 64029-8100.  Erin was a co-founder of Xceligent and held the position of Chief

People Officer or Chief Human Resources Officer at Xceligent from at least 1999 until she was

terminated from that position on or about October 24, 2017.

38.    Defendant Dawn R. Harpster is an individual residing at 14724 State Highway Tt,

Kidder, MO 64649.  Harpster was a senior researcher and manager at Xceligent from at least

2014 until on or about the Petition Date.

39.    Defendant Nathan Lipowicz is an individual residing at 1005 SW 44th St, Blue

Springs, MO 64015-4507.  Lipowicz held the position of Chief Research Officer at Xceligent

from at least 2012 until on or about the Petition Date.

## FACTUAL ALLEGATIONS

**I.    Doug Consistently Encouraged Employees To Steal Data From Competitors and Lie About Their Activities.**

40.    From Xceligent's founding, Doug refused to make the necessary investments in

legitimate commercial real estate data.  As Doug knew, the legitimate process for researching,

collecting, and creating commercial real estate data and taking professional-grade photographs of

commercial real estate properties is extraordinarily time- and labor-intensive.  It requires

constant communication with real estate brokers and other industry professionals to ensure that

data are being kept up-to-date, a large staff of researchers who know the relevant market inside

and out, site visits by researchers in the field who are trained to collect information on physical

structures and take professional property photos, and significant investments in product

development, both to build internal tools to facilitate the gathering and organization of commercial real estate information and software for end-users to consume the data.

41.    Instead, Doug had his employees supplement their inadequate efforts to legitimately obtain commercial real estate data and photographs by free-riding off content stolen from competing websites. Such an operation required only a fraction of the capital of a legitimate business enterprise, and employees and agents could be paid low wages to manually "crawl" competing websites in search of content to integrate into Xceligent's CDX database and CommercialSearch website.

42.    The personal prior experience of the Currys foreshadowed trouble from the start. The couple previously had founded and then shuttered Pinnacle Title and Pinnacle Appraisal in Kansas City. The Pinnacle companies were implicated in the largest mortgage fraud in that city's history. Brent Barber, a close friend and business associate of the Currys, was sentenced to 12 years in federal prison for procuring millions in fraudulent mortgages and bilking innocent victims in fake real estate transactions. The Currys cooperated with the FBI and avoided indictment.

43.    At Xceligent, Doug adapted his experience at Pinnacle Title and Pinnacle Appraisal to create a business model that appeared at first glance to be legitimate, but which ultimately depended on freeloading off competitors. At his direction, managers at Xceligent sought to prop up its products in new markets by copying competitors' content. At the outset, Doug either turned a blind eye to this activity, or actively encouraged it.

44.    For example, Xceligent's launch in Phoenix had been crippled from the start by haphazard data collection efforts that left "thousands of missing buildings" in "every property class," according to Xceligent's former regional vice president of sales. To fill those gaping

13

holes, an Xceligent director, Katie Glass, used the CoStar subscription database account of her husband (a commercial real estate broker) to take all the information necessary to fill out the Phoenix market in Xceligent's products.

45.    According to the sworn declaration of a former Xceligent employee, "Ms. Glass indicated that she had acquired these reports from CoStar's database using her husband's CoStar subscription," so that the information could be used "for the purpose of building Xceligent's Phoenix market," but admonished the employee not to "attribute the source of the data."  The former Xceligent employee described this conduct as unethical.

46.    Tellingly, Doug refused to allow Xceligent to track the genesis of its commercial real estate content, for fear of creating a record of the truth:  that the content integrated into Xceligent's system was stolen from competitors.  This failure has proven catastrophic, as years later in the CoStar litigation and an audit initiated by the FTC, Xceligent could not separate legitimately obtained content from the extensive content it copied.

47.    Xceligent's unlawful playbook was utilized in multiple markets.  By way of further example, when Xceligent began efforts to expand to central Florida, it hired a former real estate broker, Danny Rice, as a new sales executive.  Soon after his arrival, Rice sent an email to Doug, offering to provide him with "all the spreadsheets" that Rice's former employer, a brokerage firm, used to keep track of commercial real estate properties in Orlando, Tampa, and Fort Myers.  Rice told Doug that the spreadsheets were "populated from CoStar exports," i.e., data from Xceligent's competitor CoStar, and would ensure that CoStar customers who decided to switch to Xceligent would have "a seamless transition from Costar to CDX," Xceligent's product.

48.    Hours later, Doug replied to Rice, "Awesome.  I will call you."

49.     Based on the sworn declaration obtained from a former brokerage colleague of Rice, soon after receiving Doug's approval Rice gave Doug his former employer's spreadsheets of CoStar exports, and asked his colleague to provide him with the broker's CoStar (LoopNet Premium) subscription account credentials so that Rice could copy even more data from Xceligent's main competitor into Xceligent's system.  Rice also asked the broker to give Rice a market report containing other CoStar data.  The broker agreed to both requests, and his firm took advantage of the opportunity to cancel its CoStar subscription and switch to a cheaper subscription to Xceligent (organized by Rice).  Of course: Why pay for CoStar for the data in its system when you can pay Xceligent less and get access to the same (stolen) content?

50.     Xceligent then announced its expansion to central Florida with much fanfare. Doug rewarded Rice with a promotion to Regional Vice President of Sales for the Florida region, and Rice later became Xceligent's Chief Revenue Officer.  At Xceligent, there was a direct correlation between a willingness to copy competitors' content and advancement up the ranks.

51.     The broker involved in the scheme later admitted that although Xceligent's property inventory in central Florida was "comparable" to CoStar's inventory at the time of Xceligent's launch—presumably because of Rice's data theft—over time Xceligent was not "able to keep up."  That is because Doug and Lipowicz refused to invest in legitimate research methods, preferring instead for their managers to surreptitiously fleece competitors and cover up their misconduct with specious claims about Xceligent's rapid growth.

52.     Indeed, Doug himself frequently made statements about Xceligent's research capacity and market coverage that were entirely untethered from the facts.  For example, in 2012, Doug announced that Xceligent would launch a new website, CommercialSearch.com, with "700,000 to 800,000" commercial real estate listings.  Darren Currin, *Changing Landscape of*

15

*Commercial Real Estate Research*, The Journal Record (Aug. 30, 2012). Yet in 2017—*five years* later—Xceligent's internal research team calculated that it had populated CDX with less than half of that number (just over 300,000).

53.    As another example, in or around May 2012, Doug publicly stated that he would more than double Xceligent's geographic coverage within three years, with Xceligent expanding from 30 to 65 markets by 2015. Doug knew, however, that Xceligent did not have the research capacity to double its market coverage, even in twice that amount of time.

54.    Accordingly, Doug routinely altered deadlines in order to pretend that Xceligent was on track to fulfill his wild promises. Just a year after he announced that Xceligent would expand to 65 markets by 2015, he stated that Xceligent planned to achieve that result by *2016*. When 2016 arrived and Xceligent was nowhere near market coverage of 65 markets, Doug once again moved the goal posts. This time, he claimed that Xceligent planned to cover 65 markets by *2018*. At the time of Xceligent's bankruptcy in December 2017, Xceligent was nowhere near achieving Doug's repeatedly revised "promise."

55.    From 2012 to 2017, Xceligent's parent company poured approximately $150 million into Xceligent, only to pull out of the business entirely at the end of 2017, without ever making a dime of profit. That is because the Currys and Lipowicz squandered that investment, and others, by launching a massive unlawful enterprise to copy content from competitors rather than build a sound foundation for growth.

## II.    The Defendants Squandered Xceligent's Assets on a Global Scheme to Copy Competitors' Data and Photographs.

56.    While Xceligent managers implemented various schemes to steal competitors' content on an ad hoc basis—such as by secretly contriving to obtain access credentials from a spouse (like Director of Client Services Katie Glass) or a former colleague (like Chief Revenue

16

Officer Danny Rice)—the Currys and Lipowicz were busily orchestrating a global piracy operation.  For that, they needed willing accomplices with the moral flexibility to work intimately with the "researchers" who would actually carry out that piracy.

57.     They found such an accomplice in Harpster, who was hired by the Currys in 2014 to work under Lipowicz, and help supervise covert operations by offshore contractors to copy real estate data from Xceligent's competitors into its database.

58.     Together, the Currys, Lipowicz, and Harpster assembled a team of domestic employees and offshore contractors who willfully copied (at least) tens of thousands of CoStar-copyrighted photographs and massive amounts of commercial real estate data from CoStar websites, accessing those websites *millions* of times, despite being persistently notified that their access was unauthorized.  An audit conducted by an independent monitor appointed by the FTC concluded in October 2018 that Xceligent improperly had derived *at least* 38,489 copyrighted photographs from CoStar.

59.     In order to covertly obtain content from competing sites like CoStar's LoopNet, Xceligent researchers acting at the Defendants' direction and control circumvented the competitors' technological anti-piracy measures.  They did so by using such devices as TOR browsers, proxy servers, and rotating IP address.  They also ensured that the full scope of Xceligent's access, copying, and infringement would be impossible to determine after-the-fact, by having researchers mask their identities when accessing competing websites, crop and replace watermarks in photographs, and falsify—or fail to create—records regarding the provenance of Xceligent's ill-gotten content.

60.    Former Xceligent employees confirm that the Defendants and other executives were aware of and, indeed, directed this scheme.  According to statements provided by those former Xceligent employees:

a.    "I was told by management, including Nate Lipowicz, that access to LoopNet was 'business critical' for Xceligent and I was instructed to change the Xceligent IP address in order to re-gain access to LoopNet."

b.    Theft from CoStar was so "wide spread" within the company that "everyone" knew about it, including executives.

c.    "It was common knowledge within Xceligent that because [Doug] Curry and Erin were such micromanagers and were so heavily involved with all decision making, they were aware of the copying of CoStar content from LoopNet and Xceligent's practice of changing IP address to get around LoopNet's blocks."

d.    Lipowicz said Xceligent "had a way into CoStar."  He would send Google Docs full of CoStar information to add to research associates' lists.  Associates had "1000% certainty that every single employee knew they were using CoStar's information." "This came from the top.  Everyone knew."

e.    "Xceligent managers . . . instructed me, and other researchers, to access LoopNet listings and copy all of property listing information (e.g. rate, square footage) to populate Xceligent's databases."

f.    "The searches on LoopNet and LoopLink were almost never the result of a broker request, but rather at the direction of Xceligent senior management."

g.    "In addition to copying from LoopNet, the Xceligent managers also instructed me and other Market Analysts to populate Xceligent databases using any content I could retrieve from a Google search, including data on broker sites that were clearly designated as being powered by LoopLink or CoStar."

h.    "Xceligent managers specifically instructed me and my colleagues to crop out the watermark on any image that we copied from the internet, including the CoStar watermarks on photos we copied from LoopNet."

LEGAL\43200280\3 00600.9698.000/420979.000

61.     As early as 2013, Lipowicz and his subordinate, Vice President of Research Brent

Hansen, were instructing Xceligent employees to use TOR browsers (which anonymize an

Internet user) as part of the "game plan to get Xceligent's [IP] address hidden in order that the

[researchers] can update listings" when rival Costar's website "LoopNet blocked them."  At

Lipowicz's direction, Xceligent's technical team began "helping everyone set up a program

called TOR: Project Anonymity" so that employees could "use the TOR browser to access

[L]oop[N]et."

62.     The Currys and Lipowicz also authorized the hiring of offshore agents to

perpetrate much of their piracy, including Avion in the Philippines and MaxVal in India.

Harpster was a key liaison between Xceligent management and Avion, and Lipowicz was the

primary liaison between Xceligent management and MaxVal.

### A.    The Philippines

63.     At the ultimate direction of the Currys and Lipowicz, Avion used sophisticated

methods to circumvent CoStar's technological security measures and gain unauthorized access to

LoopNet and other CoStar websites—such as rotating IP addresses, TOR browsers, proxy

servers, and virtual private networks ("VPNs")—to copy CoStar-copyrighted photographs and

commercial real estate data.

64.     Xceligent's point people for the Avion scheme were Harpster, a manager named

Leslie Houston ("Houston"), and a vice president named Brett Hansen ("Hansen"), all of whom

reported to Doug and Lipowicz.

65.     Evidence obtained from Avion confirms that Houston helped manage Avion's

piracy scheme.  For example, in a chat log located in Avion's business records, Houston

informed Avion that "LoopNet blocks us after so many hits from our IP address and we have to

switch IP addresses," and asked if Avion had "more than 1 IP Address[.]"

66.      In another chat log, an Avion manager followed Houston's lead, instructing Avion researchers: "Guys you can use TOR browser to access LoopNet," and "[i]f . . . TOR for loopnet is not working, try kproxy.com or other proxy browser [or] server, . . . inform us any message prompted by your browser if you can't access the said site." Additionally, in a pleading in the Philippines concerning a criminal investigation of Avion's circumvention of CoStar's anti-piracy measures, Avion's CEO and owner, Von Ryan Nagasangan, admitted that "Avion accesses LoopNet.com," and "Avion employees utilize technological measures to avoid blocking activities." As an example of this misconduct, the following screenshot shows an Avion researcher working from a Google spreadsheet and accessing, via the "kproxy" proxy server, information on the apartment building located at 2900 E 91st Street, Chicago, Illinois on the CoStar-owned website Apartments.com, while a tab for Xceligent Research is also open in her browser, so that she may upload into Xceligent's systems the data she copies from the CoStar website.



67.      The Defendants knew that Xceligent was not authorized to access LoopNet and other CoStar sites.  Xceligent and its agents received thousands of "Access Denied" notifications from CoStar during their attempts to access LoopNet without authorization.  As shown below, the terms of each of those notifications clearly stated that users were "in breach of the binding LoopNet Terms and are blocked from accessing LoopNet."  LoopNet's applicable Terms of Use state, "No employee, independent contractor, agent or affiliate of any competing real estate information, analytics or listing service is permitted to be a User or Customer or to view, use or access the LoopNet website without express written permission from LoopNet."



68.     Nevertheless, Xceligent researchers and Avion (and MaxVal) contractors hired and directed by Xceligent continued accessing LoopNet without regard to CoStar's notice that their access violated LoopNet's Terms of Use.  As another example, in the image below, an Avion researcher is viewing a listing on LoopNet, via the aptly named "[H]ide[M]e" proxy, for a property located on Staten Island, while simultaneously accessing a Google spreadsheet called "NYC Manhattan," which was used to populate Xceligent's database as part of its failed expansion into New York.



69.     This was also an example of Xceligent agents copying content to fulfill Doug's representations to consumers about Xceligent's expansion to new markets.  In August 2016, Doug stated that hundreds of Xceligent employees were working on building Xceligent's database of New York City property listings.  Doug must have known this to be false because, in reality, Avion researchers were using proxy servers in the Philippines to view LoopNet listings and update spreadsheets of Xceligent property data and photographs for the New York region.

70.     The Currys and Lipowicz used Harpster as a liaison with Avion, and sent other managers to the Philippines on a regular basis to work with the vendor.  Avion worked hand-in-hand with Xceligent management to circumvent CoStar's security measures.  For example, Hansen and Houston worked directly with Xceligent's IT department to set up a VPN for Avion researchers to use to circumvent CoStar's security and access CoStar websites.

71.     Xceligent emails contain extensive discussion of helping Avion circumvent CoStar's anti-piracy measures.  For example, in a June 3, 2016 email exchange, Xceligent's former Technical Operations Manager, Jeremy McQuown, suggests that Xceligent itself use a proxy server to gain access to CoStar websites, "like what we did for [the] Philippines."  In another example, in a March 31, 2016 email, Houston reports that Avion has "LoopNet Access" because "Von [Ryan Nagasangan, Avion's CEO,] paid for 10 accounts of a paid proxy site that allows them to access it 'incognito like.'"

72.     Houston routinely instructed researchers to copy commercial real estate listing data from LoopNet.  For example, in one email chain with a researcher who found she could not update property data because she had been blocked, Houston advised her to "wait a bit and try to grab it off of LoopNet."  Other times, when confronted with complaints about blocked access to LoopNet, Houston advised researchers that they would have to "be creative."

73.    Upon gaining (unauthorized) access to CoStar websites like LoopNet, Avion employees copied CoStar-copyrighted photographs and commercial real estate data from those competing websites and provided such photographs and data to Xceligent for display in its competing products and websites.  As evidenced by Avion auditor spreadsheets, which were provided to and reviewed by Xceligent managers, including Ashley Herron, Avion researchers were instructed to obscure the source of the data and photographs.  For example, these spreadsheets show Avion supervisors directing researchers as follows: "[w]hen copying listing notes from Loop[N]et, please rephrase it;" "please revise verification notes [and] do not mention '[L]oop[N]et' as much as possible;" and "crop the photos not to include the watermarks."

74.    As explained by a former Avion research manager, Xceligent management, including Doug and Lipowicz subordinates Hansen and Houston, instructed Avion researchers to copy content from LoopNet, notwithstanding Xceligent/Avion training materials that purported to prohibit such copying:

> When it came to sources of data collection including sources of photos and property data, Leslie [Houston] told us (me and my [research] team) that we could access LoopNet and other third party websites indicated as "to be avoided" in my FAQs and Notes), take data from said sites, and capture photos from those sites using screenshotting software (such as Greenshot), provided that we cropped the photos to cut off any watermarks.

> During the entire training session with Leslie, which lasted 4-5 days, Doug [Curry] and Brent [Hansen] occasionally jumped into the GoTo session to greet the [research] team (as Xceligent had the ability to monitor the training room through a webcam).

> ***

> [A]t a few GoTo meetings with the Nagasangans [who own and manage Avion] and Xceligent's Doug [Curry], Brent [Hansen] and Christina [Dietrich], I specifically brought up the various points of inconsistency between Leslie's training and the Xceligent materials on which I had based my FAQs and Notes.  I particularly asked about the inconsistency relating to accessing and collecting data and

24

photos from third party sites (such as LoopNet).  All of them—the Nagasangans as well as Xceligent's Doug, Brent and Christina—told me to listen to Leslie, allow her to do her own training module and do as she says, i.e., that they can access and copy content from LoopNet and the other supposedly banned sites. Joy [Nagasangan, the Avion COO] admonished me not to question Leslie.

75.    Xceligent's mass-piracy scheme in the Philippines has led to multiple indictments against the leadership of Avion.  On November 20, 2017, the Philippines Department of Justice issued a subpoena to Avion's principals regarding potential violations of the Cybercrime Prevention Act of 2012.  Then, on January 3, 2019, the Department of Justice issued a Resolution recommending criminal charges, which states, among other things, that:

> a.    Avion engaged in "unauthorized access," or "hacking," when it circumvented CoStar's anti-piracy measures for Xceligent, and this is "the classic example of a computer crime";
>
> b.    "Investigations reveal that Xceligent has published Costar's photographs on Xceligent's competing website";
>
> c.    "Avion aided Xceligent by accessing LoopNet ln order to copy those photographs before transmitting them to Xceligent for publication";
>
> d.    Avion's principals and employees used VPN sites (including "hidemyass.com" and "hide.me"), TOR browsers, and IP-address rotation to execute the hacking scheme for Xceligent; and
>
> e.    "Notwithstanding the terms of use required by LoopNet on the use of their website and the ban on access from the Philippines, Avion continued to access their competitor's websites and databases, in violation of the Cybercrime Prevention Act."

76.    Accordingly, on January 17, 2019, the owners, senior management, and directors of Avion were indicted in the Philippines for violations of the Cybercrime Prevention Act of 2012.  The charging document states that they "willfully, unlawfully and knowingly illegally access[ed] in whole or in part . . . CoStar databases . . . without right by circumventing CoStar's country-blocking and abuse-monitoring softwares."

25

77.    The prosecution is ongoing.  As it progresses, Xceligent management—including the Defendants—are likely to be increasingly involved as sources of evidence and potential targets.

78.    There can be no question that the wrongdoing by Defendants was a carefully considered business plan.  One of the best examples is the selection of Avion, based in the Philippines, as Xceligent's main research contractor.  During the time that Avion was performing "research" for Xceligent, the Defendants knew that Avion was also working for the notorious website backpage.com ("Backpage").

79.    According to a January 2017 report of the U.S. Senate Permanent Subcommittee on Investigations, "Backpage is involved in 73% of all child trafficking reports that the National Center for Missing and Exploited Children (NCMEC) receives from the general public (excluding reports by Backpage itself)."  And Avion was key to Backpage's criminal scheme. As the *Washington Post* reported in July 2017, Avion facilitated Backpage's illicit actively "by adding and promoting" fake postings on other websites designed to attract customers to Backpage.  *Members of Congress Press Sessions to Investigate Sexual Ads at Backpage.*com, The Washington Post (July 13, 2017), https://www.washingtonpost.com/local/public-safety/congresswomen-press-sessions-to-investigate-sexual-ads-at-backpagecom/2017/07/13/99ebaed8-6752-11e7-9928-22d00a47778f_story.html.

80.    A few months later, in April 9, 2018, the United States Department of Justice unsealed a criminal indictment against Backpage's principals based in part of documents showing the work that Avion did for Backpage.

81.    The Currys and Lipowicz refused to end Xceligent's profitable relationship with Avion because they apparently knew that Avion cheaply provided the lifeblood for Xceligent's

26

research operations:  property data and photographs meticulously gathered from competitors, which the Currys and Lipowicz had ensured that Xceligent had no way of legitimately gathering itself.  Thus, instead of firing Avion, the Currys and Lipowicz embarked on a series of poor efforts to *deepen* and simultaneously mask Xceligent's relationship with Avion.  They directed Xceligent to release false statements to the media claiming that Xceligent was unaware of Avion's long-standing work for Backpage.  In stories that ran in the *Dallas Morning News* and *The Washington Post*, Xceligent representatives falsely claimed "that the company . . . was not aware of Avion's work with the advertising site [Backpage]" and "[it] ha[d] no way of knowing about Avion's purported work for Backpage."

82.    In addition to its continued business ties, Xceligent helped defend Avion against a criminal investigation and a civil lawsuit brought by CoStar in the Philippines.  Even as Xceligent was hemorrhaging money, and despite the publicity about Avion's involvement in trafficking, the Currys diverted Xceligent's scarce resources to retain and pay for Avion's shadow counsel in the Philippines.  It was those highly paid, Xceligent-funded lawyers who drove the legal strategy for defending the lawsuits against Avion.

**B.    India**

83.    The offshore piracy operation engineered by the Currys and Lipowicz was not limited to the Philippines.  In India, Xceligent, led by Doug and Lipowicz, directed the copying of competitors' content through Xceligent's agent MaxVal and its American affiliate REBO.

84.    On October 23, 2017, the U.S. District Court for the Western District of Pennsylvania entered a Judgment and Permanent Injunction against REBO for its work on behalf of Xceligent.  The court entered judgment against REBO for contributory and vicarious copyright infringement of CoStar-copyrighted photographs, conspiracy with Xceligent and MaxVal to violate the Computer Fraud and Abuse Act by accessing CoStar's websites without

27

authorization, and conspiracy with Xceligent and MaxVal to engage in unfair competition against CoStar.

85.    The judgment was supported by a factual stipulation entered by REBO, which states that "REBO's operations for the Xceligent account [we]re handled by its affiliate and agent . . . MaxVal . . . in India."  Those operations for Xceligent included "copy[ing] content from CoStar sites such as LoopNet, ShowCase and CityFeet directly into Xceligent's system." The stipulation explains that "[s]ince at least 2012, Xceligent management and employees directed REBO/MaxVal to copy content, including data and flyers that included photographs, from websites owned by CoStar."  The REBO stipulation further states that Doug "visited the MaxVal operation in India to directly train the operations team."

86.    The stipulation elaborates that Xceligent provided for REBO/MaxVal to circumvent CoStar's anti-piracy measures to copy its content:

> Xceligent management set up a VPN connection for the REBO/MaxVal team to use specifically to access LoopNet in order to circumvent the website block implemented by CoStar, and the REBO/MaxVal team agreed to make use of it.  The VPN connection was put in place so that a team of approximately 80 REBO/MaxVal researchers could access LoopNet without being caught by CoStar. When the VPN was not working, Xceligent directed the REBO/MaxVal team to use other means such as proxy servers, a tool commonly used by hackers, to circumvent CoStar's blocking technology.

87.    The Stipulation echoes contemporaneous documents from Xceligent, REBO, and MaxVal that reveal the mass-piracy scheme.  For example:

    a.    In a January 15, 2013 email, Xceligent manager Frank Bandelow sends a REBO/MaxVal manager named Tanvir Khan a link to a LoopNet webpage for REBO/MaxVal to use in updating a property listing in Phoenix.

    b.    In a January 15, 2013 email, Bandelow instructs Khan to copy listing information from cityfeet.com ("Cityfeet"), and writes:

"Funny thing is that Cityfeet is owned by LoopNet who is owned by Costar."

c. In a January 24, 2013 email, with respect to a property in Las Vegas, Bandelow instructs REBO/MaxVal: "Just go ahead and use what Showcase is showing." Showcase is another CoStar website.

d. In a February 27, 2013 email to Lipowicz from Xceligent employee Rick Shuler, Shuler informs Lipowicz that he "set up a VPN account" for REBO/MaxVal to use to access LoopNet and other CoStar websites. Lipowicz forwards that email to Khan and instructs him that "you should only have the [REBO/MaxVal] researchers access this when trying to access L[oop]N[et] sites and shouldn't use it exclusively." Khan responds: "Thanks for this wonderful solution to LoopNet Accessing Problems."

88. To cover their tracks, the Currys and Lipowicz ensured that Xceligent would say one thing while doing another. As the REBO stipulation explains: "From time to time Xceligent's instructions indicated that LoopNet and other CoStar sites should not be used by REBO/MaxVal to copy content. But in practice REBO/MaxVal accessed these sites frequently to copy content, and Xceligent knew it. In fact, particularly during training sessions, Xceligent directly instructed REBO/MaxVal, and REBO/MaxVal agreed, to copy content from CoStar sites such as LoopNet, ShowCase and City Feet directly into Xceligent's system, and to prioritize copying from Showcase and Loop Net."

89. This approach mirrors Xceligent's approach with Avion, discussed above, whereby Xceligent trainers (including Houston) and Avion management (including Joy Nagasangan) instructed line-level "researchers" to disregard written restrictions on copying from LoopNet and other CoStar sites.

90. The REBO stipulation summarizes the unlawful scheme as follows:

[A]s a matter of practice, and with Xceligent's knowledge and at Xceligent's direction, the REBO/MaxVal operations team used measures to circumvent CoStar's security measures and thereby hack into Costar sites in order to populate the Xceligent databases

with content copied from CoStar.  This practice occurred after the REBO/MaxVal team had been repeatedly denied access to LoopNet, a fact that was known to Xceligent.  In order to access the CoStar sites, the REBO/MaxVal team used circumvention technology provided by Xceligent.  And the practice of copying CoStar content involved the use of Loop Net accounts created by the REBO/MaxVal team . . . .

91.    These admissions became a matter of public record on Friday, October 20, 2017, and Doug and Erin were fired almost immediately thereafter.

92.    The repercussions also ultimately extended to India.  On April 16, 2018, an Indian court issued a permanent injunction against MaxVal, precluding it from accessing CoStar websites and databases for competitive purposes or copying CoStar content without valid authorization, approving financial terms to resolve the case against MaxVal, and dismissing the asserted counterclaim against CoStar.

93.    In reaching that resolution, MaxVal admitted that:

a.    "Xceligent executives and managers . . . instructed Maxval researchers to access and copy content from websites owned by Xceligent's competitor CoStar (including LoopNet.com. Showcase.com and Cityfeet.com (and collectively, the 'CoStar-owned websites'))";

b.    "Xceligent executives and managers, including Xceligent's Chief Research Officer Nate Lipowicz, set up technological workarounds—including but not limited to virtual private networks ('VPN') and proxy servers—to circumvent the access denials, so that the Maxval researchers were able to continue to access CoStar-owned websites";

c.    "Xceligent executives and managers, including Messrs Lipowicz and Bandelow, instructed Maxval researchers to copy content from, and download flyers, brochures, and other digital files from, CoStar-owned websites;"

d.    "Xceligent executives and managers further instructed Maxval researchers to upload this content and these digital files into Xceligent's databases without first determining whether this data or these digital files were protected by relevant laws (including CoStar's terms of use and US-copyright law)";

30

e.   "Xceligent's Chief Executive Office Douglas Curry, personally
visited Maxval in 2005 to supervise the assignments undertaken by
Maxval for Xceligent"; and

f.   "Maxval was misled by Xceligent and its executives and managers,
including primarily Messrs. Curry, Lipowicz and Bandelow, but
now understands that Xceligent's scheme to access CoStar-owned
websites and copy content was unlawful."

94.    As it did with Avion, the Currys also diverted Xceligent resources to prop up

MaxVal's defense against CoStar's civil case against it in India.  Xceligent's chosen Indian

shadow counsel likewise directed MaxVal's defense and coordinated closely with Xceligent's

own lawyers.

*    *    *

95.    The international mass-copying scheme executed by the Currys and Lipowicz

resulted in Xceligent's most valuable possession, its commercial real estate database, being

infested with stolen content—including at least tens of thousands of infringing photographs and

an untold amount of stolen data—to an incurable extent.  Therefore, not only did their conduct

subject Xceligent to hundreds of millions of dollars of potential liability and legal costs, it also

had a devastatingly negative impact upon the value of Xceligent's estate.

**III.    Doug Irrationally Ignored Bet-The-Company Litigation in Favor of a "Damn the
Torpedoes" Strategy Calculated to Entrench His Position as CEO.**

96.    On December 12, 2016, CoStar filed a federal lawsuit against Xceligent for

infringing CoStar's copyrights, breaching CoStar's contractual terms of service, violating the

Computer Fraud and Abuse Act by circumventing CoStar's anti-piracy measures to gain

unauthorized access to its databases, and violating the Digital Millennium Copyright Act by

removing CoStar's watermarks from CoStar-copyrighted photographs and replacing them with

Xceligent's.  CoStar amended its complaint on June 21, 2017, adding supplementary factual

31

allegations and an additional claim against Xceligent for engaging in unfair competition by stealing CoStar's content on an industrial scale and free-riding on CoStar's investment and labor.

97.    Doug effectively ignored the factual bases for CoStar's claims.  He refused to conduct an adequate internal investigation of the allegations, or remediate the wrongdoing and change practices, despite the incredible legal exposure, because, on information and belief, he did not want to reveal his past misconduct and did not want to admit he was currently engaging in misconduct.

98.    The massive exposure created by the aforesaid actions was self-evident. Copyright law provides for statutory damages of up to $150,000 per instance of willful infringement.  17 U.S.C. § 504(c).  And CoStar has obtained injunctions setting damages at up to $50,000 for every day of continued infringement of a single photograph.

99.    CoStar's suit against Xceligent, the proof of claim filed by CoStar in this Court, and the audit conducted by an FTC monitor indicate that Xceligent engaged in tens of thousands of instances of infringement, giving rise to hundreds of millions of dollars in potential damages. Even before discovery had started in the lawsuit, CoStar identified over 9,000 copyrighted photographs that Xceligent was infringing on its CommercialSearch.com website—and for a sample of 100 of those photographs, detailed their provenance.  Indeed, with respect to the 100 samples, Xceligent confirmed (at CoStar's request) the identities of the employees who copied and uploaded those to Xceligent's website, including employees of Xceligent, Avion, and an Xceligent-associated company in Southern California called AIR CRE.  Xceligent was unable to contest CoStar's ownership of the photographs or the fact that Xceligent had been infringing them by displaying them on its website.

100.    Ignoring this exposure, Doug allowed Xceligent researchers to continue accessing LoopNet without authorization during the litigation.  In the period from April to July 2017 alone, three Xceligent IP addresses were blocked from LoopNet more than ***10,000*** times.

101.    In addition, after filing suit, CoStar sent no fewer than fourteen (14) letters to Xceligent identifying ongoing infringement of CoStar-copyrighted photographs on Xceligent's websites and warned of the severe statutory damages for such willful infringement.  Xceligent, under Doug's leadership, effectively ignored those "take-down" letters, dramatically multiplying Xceligent's exposure for willful copyright infringement and failing to mitigate losses.  Tellingly, days after Doug was fired on or about October 24, 2017, Xceligent hastily issued its first letter in response to CoStar's correspondence (albeit a letter that only claimed that ***one*** of the slew of exemplar infringing photographs was "being pulled into" its website by a third-party provider).

102.    Doug refused to recognize the risks of Xceligent's lack of safeguards, and he and other officers failed to install an easily obtainable filter for copyright infringement.  Instead, Xceligent continued to pay a company named WebPurify to check for watermarks, but (a) only prospectively, (b) from third-party providers rather than Xceligent researchers, and (c) without any mechanism for detecting whether a watermark had been removed from the images, the practice detailed in CoStar's allegations.

103.    Doug also refused to cut ties with his hand-picked contractor Avion at any point, even after learning of Avion's indefensible and unlawful work for Backpage, which further tarnished Xceligent's reputation and doomed any chance of redeeming its operations.

104.    Indeed, the Currys effectively ignored the negative publicity in July 2017 resulting from Xceligent's connection to Backpage—including, for example, the damning *Washington Post* article of that same month—and the legal risk associated with continuing to do

33

business with Avion.  Their only apparent response was to oversee the false statements to the

press that Xceligent did not know and had no way of knowing about Avion's work for Backpage.

105.    Rather than recognizing and seeking to mitigate Xceligent's massive exposure

from the CoStar lawsuit and related public revelations, Doug vowed total victory at any cost.  In

a June 2017 statement, he proclaimed:  "We're filing a countersuit, and we intend to take it all

the way and prosecute [sic] CoStar for the actions of the last 20 years."  Likewise, in July 2017,

Doug stated:  "We gladly take up this fight and we will not rest until the industry has clear

safeguards against an obvious abuse of power by CoStar."  And in August 2017, he declared:  "It

will be an expensive case, and we are absolutely prepared to spend what it takes to finish it and

take it to trial."  "And we intend to go to court, not settle."

106.    Faced with CoStar's overwhelming factual allegations, Doug recklessly decided

to ignore the reality of Xceligent's piracy and conjure counterclaims against CoStar in a

scorched-earth counteroffensive.  Despite mounting legal fees (including for the firms hired to

help Avion and MaxVal) and Xceligent's unsustainable business losses, Doug instructed

Xceligent's lawyers to bring antitrust claims grounded in the "essential facilities" doctrine, even

though this doctrine had been roundly rejected by the courts.  As one expert observed in an

article for Law360, "This is a startling claim: Xceligent is contending it cannot offer an

independently derived database to customers, and instead needs to piggyback on a rival to enter

the market.  Yet the idea that CoStar is obligated as an antitrust matter to help Xceligent develop

a competing CRE product totally lacks legal validity."

107.    In pursuit of these counterclaims, Xceligent engendered massive amounts of

costly discovery based on wide-ranging accusations largely "upon information and belief" rather

than based on any evidence.  Indeed, throughout discovery in the litigation, Xceligent does not

appear to have *attempted* to substantiate its antitrust allegations, refusing to calculate or posit any damages, or any potential methodology for doing so.

108.    Doug rejected objections from managers who questioned his stubborn strategy. For example, one officer questioned the strategy's ethical implications, and emphasized the operational challenges associated with refusing to restructure Xceligent's IT department in a manner that would stem infringement.  Doug fired him and other officers who dissented from his manner of running the business and the litigation.

109.    Under Doug's direction, the Xceligent "leadership team" observed ballooning costs from the litigation and their negative effect on cash flow, but nothing was done to stop the bleeding that Doug's strategy caused.  Xceligent managers, including the Currys and Lipowicz, did nothing to mitigate Xceligent's accelerated decline.  To the contrary, right up until its bankruptcy, Xceligent failed to charge customers a sustainable price for a subscription.

110.    While running the company into the ground, the Currys and Lipowicz created a culture in which officers who turned a blind eye or were willing to engage in misconduct were rewarded.  Whether it was Bandelow instructing REBO/MaxVal to copy from CoStar websites, Hansen helping contractors circumvent CoStar's anti-piracy measures, Rice and Glass purloining CoStar reports, or Harpster teaching Avion to copy CoStar content, the Currys and Lipowicz allowed, enabled, and encouraged the unethical lawlessness to spread.

111.    Doug's response to Xceligent's litigation and public relations disasters and refusal to desist from or mitigate his company's unlawful misconduct were not intended to protect the best interests of Xceligent.  Doug focused exclusively on his own personal interests, to the detriment of the livelihoods of the employees at Xceligent.

35

112.    In September 2017, as Xceligent teetered on the brink, and just three months before its bankruptcy, Doug and Erin caused Xceligent to pay Bisnow, an online business publication, $85,000 for that month alone to post positive coverage of Xceligent and its litigation efforts.  An email from Doug to Erin and an Xceligent Marketing Director shows that Doug was considering signing a $500,000 contract with Bisnow.  This is another example of the Currys' willingness to spend money to keep up appearances while the company burned to the ground around them.

113.    Despite Xceligent's financial distress, Doug also continued to collect a rising base salary in excess of $350,000 (not including bonuses), and misused corporate assets for his own personal purposes.  For example, Doug signed Xceligent's lease of an apartment in New York City, ostensibly for Xceligent's expansion efforts.  In reality, however, Doug moved his personal belongings into the New York apartment, using it as his own pied-a-terre in Manhattan.

114.    Doug's efforts to entrench his position is also evident in the culture of rampant nepotism and cronyism he instituted at Xceligent.  During his leadership, Doug used his position at the top of a corporate spoils system to reward friends and family members with full-time positions and internships.

115.    The Currys also encouraged loyal subordinates to hire their relatives.  For example, Doug rewarded Lipowicz by hiring his brother, Chris Lipowicz, as an Executive Vice-President.

116.    When Xceligent's parent company inquired about the extent to which Xceligent employees consisted of family members, Erin submitted a partial list of employees.  Thirty-nine employees on that partial list—representing nearly *one-fifth* of the employees listed—were related to one another.

117.    Most troubling, Doug apparently insisted upon hiring his sister, Tracy Curry, and other relatives to gather evidence for Xceligent's litigation with CoStar, with no concern for the consequences of tasking family members, at significant cost, to conduct fact-finding in bet-the-company litigation.

118.    In an email dated August 5, 2017, Doug told Erin that he wanted Xceligent to use his sister "Tracy or your brother . . . or my brother David" to call "the sales reps from Costar" for litigation purposes.  To the extent his sister complained or found it difficult to work efficiently, Doug stated, "I can't make her efficient, but I can tell her to keep her mouth shut if she wants to get paid."

119.    Erin scolded Doug for relying on family members like his sister "to get information worthy for the lawsuit" against CoStar rather than using qualified professionals, and berated Curry for preferring to "wrap Tracy in," although "[s]he wastes a ton of time and other people's time" and "we are paying her to do it."  Nevertheless, Erin executed the steps necessary for Xceligent to officially hire Tracy Curry as a contractor, along with the wife of Chief Accounting Officer Glenn Soendker.  As Soendker stated in a contemporaneous email, his wife Sally Soendker would "be contract labor working on the CoStar lawsuit calling former CoStar sales people," and "Erin [Curry] is fully aware of this" and "should be the person to sign the new vendor form for Sally."  In fact, three members of his family worked for Xceligent, with Soendker's daughter Ashley (Herron) serving as a liaison to Avion and auditing the work of Avion's researchers.

120.    On September 30, 2017, Doug and Erin discussed correspondence with their parent company regarding Xceligent's hiring of yet another family member, Doug's brother, David Curry.  In the letter, Doug described his plan to hire David Curry "at a base salary of

$150,000"—nearly double the "current large market sales reps base salary" of $85,000.  When David Curry was fired along with his brother in October 2017, he shot off a profanity-laced email to then-CEO Jody Vanarsdale and Chief Accounting Officer Glenn Soendker demanding reimbursement for expenses as well as payment for his monthly work.

121.    The Currys' reckless spending was in breach of their fiduciary duties and deepened Xceligent's insolvency, as demonstrated by the company failing spectacularly shortly after the Currys' firing on or about October 24, 2017.  The following month, Xceligent's parent company wrote down Xceligent's carrying value to zero, an impairment of $56 million, explaining that "Xceligent is a loss-making business."  Xceligent filed for bankruptcy under Chapter 7 two weeks later.

## IV.    Doug's Self-Interested Dealings, Based on Stolen Content, Have Continued After Xceligent's Bankruptcy.

122.    As further evidence of Doug's self-interested motives, upon the commencement of Xceligent's bankruptcy, Doug immediately announced that he and Erin were launching a new, competing company, named Intrepid CRE ("Intrepid"), under their ownership and control— violating covenants with Xceligent in the process.

123.    In launching Intrepid, Doug solicited, directly and indirectly, former customers, including, for example, the Atlanta Commercial Board of Realtors.

124.    Doug blamed Xceligent's failure entirely on its parent company's "financial issues" and attempts to change "how we did business," and publicly stated that he had assembled a team and retained access to Xceligent's commercial relationships and vendors that allowed him to quickly present Intrepid as a competitor.  On public conference calls, Doug referenced using Xceligent's market data, stating that he planned for Intrepid CRE to "turn on . . . 30 of the

original markets that were, you know, cash flow positive and covered their own overhead," including "all the Midwestern markets, and our original markets."

125.    Such acts illustrate Doug's bad faith and disloyalty to Xceligent, and Xceligent's estate meanwhile has been left with a multitude of creditors having claims for costs that Doug was largely responsible for incurring.  Doug sought to seize on Xceligent's weakness and vulnerability to take its customers, employees, and confidential information.

126.    Echoing the false promises he made at Xceligent, Doug publicly boasted of being able to launch his competing service in "over 30 markets" in a matter of "weeks."  This projection either was knowingly false or, more likely, revealed Doug had looted Xceligent's commercial real estate database.  Doug's statement that he would launch Intrepid in over 30 markets in few weeks—an undertaking that realistically would take a large, experienced team of developers and similar personnel many months, if not years, to accomplish legitimately— strongly suggests that Doug obtained unauthorized access to Xceligent's commercial real estate database, trade secrets, and other assets.  Indeed, Doug went so far as to infringe Xceligent's trademark and trade dress in public by adopting a logo for Intrepid clearly derived from Xceligent's logo.

127.    Doug's website for Intrepid remained live until January 13, 2018—more than a week after the Trustee sent the Currys a letter exhorting them to cease and desist from violations of their covenants with Xceligent.  Before the website's deactivation, the Currys issued public statements acknowledging that the "nonsolicitation and noncompete language" in their "2012 agreements" with Xceligent barred them from "pursuing the Intrepid CRE Initiative at this time," stating that "for now" they were "stepping away to let the industry carry this torch forward."

128.    Following these statements, the Trustee sent a letter dated January 12, 2018, requesting clarification that the Currys "will never use the Debtors' assets and Confidential Information . . . , whether as part of Intrepid CRE or any other initiative."  The Trustee also requested that the Currys turn over "any of the Debtors' intellectual or other property" in their possession.  Tellingly, the Currys never responded to the Trustee's letter.

129.    Undeterred, three months later, in April 2018, Doug created a thinly disguised enterprise that is best viewed as a pseudo-Xceligent 3.0: a new commercial real estate entity named Empirical CRE, holding himself out as CEO and employing Lipowicz and other former employees of Xceligent——including Blake Weller, Xceligent's former Director of New Market Launch, and Sam Lewis, Xceligent's former Senior Vice President of Marketing and Communications.  At one point, Erin Curry was held out as Empirical CRE's Chief Operating Officer, and Mr. Weller as Empirical CRE's Chief Research Officer.

130.    Over time, the list of Xceligent-affiliated Empirical CRE employees and executives grew.  In total, at least seven former Xceligent executives and high-level employees are identified as affiliated with Empirical CRE, including Xceligent's former Chief Accounting Officer Glenn Soendker, who became Empirical CRE's Chief Financial Officer in May 2019.

131.    Given the numerous similarities between Xceligent and Empirical CRE, it appears that the latter is cannibalizing the former in whole or in part.  At least two former Xceligent executives tout Empirical CRE's commitment to providing commercial real estate information globally on their LinkedIn profile pages, a claim that is echoed on the Empirical CRE website itself (www.empiricalcre.com).  Empirical CRE's website further boasts of its ability to offer software to access and search properties, analyze property data, generate client reports, create

tour books, and manage property availability using a mobile app—software which, to the extent it relies on code written by or for Xceligent, is property of the bankruptcy estate.

132.    Following the Xceligent playbook, Empirical CRE is conducting "research" activities using contractors based in the Philippines.  On information and belief, Harpster has attempted to sell Xceligent's database—including a significant volume of data belonging to CoStar—to third parties in that country.  The Trustee has demanded that Harpster cease and desist from attempting to sell all or part of the database and immediately turn over any assets of Xceligent's estate in her possession, but that request has gone unanswered.

133.    Doug registered Empirical CRE as a Delaware corporation in 2018 under the name Empirical CRE Holdings Corp., listing its business address as his and Erin's residence in Grain Valley, Missouri.  Doug and Lipowicz both serve as executive officers, and the new entity's director is reportedly Mikael Nyberg—a managing director at Moody's, which reportedly holds an ownership interest in Doug's newest entity pursuant to a $2.4 million equity funding round that Doug initiated on December 21, 2018.

134.    The fact that the Currys and Lipowicz – given their track record of unethical conduct and value destruction, and the evidence that they are actively depleting Xceligent's bankruptcy estate, breaching restrictive covenants with Xceligent, and leveraging contractors in the Philippines – appears to have found a way to obtain a significant investment from Moody's is surprising, to say the least.  Indeed, the Currys' public statements in January 2018 that they were bound by restrictive covenants precluding them from going forward with Intrepid CRE placed Moody's on notice that financing a similar venture by the Currys would violate the terms of agreements with Xceligent.

41

135.    None of the Defendants have returned any property of Xceligent's estate—including any trade secrets, portions of Xceligent's commercial real estate database, or other assets.  On information and belief, they possess and are still using Xceligent assets—and thereby diminishing the value of the estate, infringing the intellectual property of Xceligent and possibly its competitors, and breaching binding agreements with Xceligent.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
**Equitable Subordination**
***(Against Defendants Doug Curry, Erin Curry, and Nathan Lipowicz)***

136.    The Trustee repeats and realleges each and every allegation set forth above, and incorporates them herein by reference.

137.    Defendants Doug Curry, Erin Curry, and Lipowicz engaged in inequitable conduct which resulted in injury to Xceligent's creditors and conferred unfair advantages upon them.

138.    At all relevant times, Defendant Doug Curry was Xceligent's Chief Executive Officer and a member of Xceligent's board of directors, Defendant Erin Curry was Xceligent's Chief People Officer or Chief Human Resources Officer, and Defendant Nathan Lipowicz was Xceligent's Chief Research Officer.

139.    As officers of Xceligent (and in Doug Curry's case, a director), Defendants Doug Curry, Erin Curry, and Lipowicz owed fiduciary duties to Xceligent, including duties to act loyally, with due care, and in the best interests of Xceligent.  They also owed a duty not to waste corporate assets.

140.    As described above, Defendants Doug Curry, Erin Curry, and Lipowicz breached their fiduciary duties of loyalty and care by encouraging Xceligent employees to engage in unlawful theft and copyright infringement of competitors' content, and failing to cease,

42

investigate, or mitigate their unlawful conduct even in the midst of civil litigation that posed an existential threat to Xceligent's survival.

141.    Defendants Doug Curry, Erin Curry, and Lipowicz also wasted Xceligent's assets on their domestic and overseas campaign of unlawful misconduct, and on a misguided counteroffensive against CoStar in pending litigation seeking to hold Xceligent accountable for its misconduct.  In doing so, Defendants Doug Curry, Erin Curry, and Lipowicz acted solely to preserve their own positions at Xceligent, and to the detriment of Xceligent.

142.    Under these circumstances, equitable subordination is consistent with the Bankruptcy Code.  Based on the inequitable conduct described herein, the claims of Defendants Doug Curry, Erin Curry and Lipowicz should be subordinated to those of innocent creditors pursuant to 11 U.S.C. § 510(c)(1).

### SECOND CLAIM FOR RELIEF
**Turnover of Debtor's Property**
**(*Against Defendants Doug Curry, Erin Curry, Nathan Lipowicz, and Dawn Harpster*)**

143.    The Trustee repeats and realleges each and every allegation set forth above, and incorporates them herein by reference.

144.    Pursuant to 11 U.S.C. § 704, the Trustee has a duty to collect any and all assets of Xceligent's estate and to effectuate an orderly liquidation of Xceligent's estate.

145.    Upon information and belief, Defendants Doug Curry, Erin Curry, Lipowicz, and Harpster are in possession, custody, or control of property of Xceligent's estate that they used to launch the business of new corporations to compete with Xceligent, including trade secrets, customer lists, potential customer lists, employee lists, and other assets or attempted to sell to third parties.

146.    Demand for the turnover of property of Xceligent's estate has been made.  The Trustee sent letters to the Currys and to Harpster, as well as to Empirical, which includes Doug Curry and Lipowicz as executive officers.  However, the Defendants have failed and refused to comply with the Trustee's demands for turnover of such property.

147.    Upon information and belief, the trade secrets, customer lists, potential customer lists, employee lists, and other assets in Doug Curry's, Erin Curry's, Lipowicz's, and Harpster's possession, custody, or control constitute property of Xceligent's estate and are subject to turnover pursuant to 11 U.S.C. § 542.

## PRAYER FOR RELIEF

WHEREFORE, the Trustee prays for judgment against Doug Curry, Erin Curry, Nathan Lipowicz and Dawn Harpster as follows:

A.    For an order equitably subordinating the creditor claims of Doug Curry, Erin Curry, and Nathan Lipowicz;

B.    For an order for Doug Curry, Erin Curry, Nathan Lipowicz, and Dawn Harpster to immediately turn over to the Trustee the property of Xceligent's estate in accordance with section 542 of the Bankruptcy Code; and

C.    For costs of suit and attorney's fees.

Dated:  October 23, 2019                    Respectfully submitted:

                                                            /s/ John T. Carroll, III
                                                            John T. Carroll, III (DE No. 4060)
                                                            1201 North Market Street
                                                            Suite 1001
                                                            Wilmington, DE 19801
                                                            Telephone:  (302) 295-2028
                                                            Facsimile:  (302) 295-2013
                                                            jcarroll@cozen.com

                                                            *Counsel for Alfred T. Giuliano, Chapter 7 Trustee*

44